IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:04CR00025 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| MARIO ALBERTO GARCIA HOLGUIN, | ) | |
| | ) | |
| Defendant, | ) By: | B. WAUGH CRIGLER |
| | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3) and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

The Grand Jury has returned a multiple count Indictment charging defendant in Count One with knowingly conspiring to distribute, and to possess with intent to distribute, 50 grams or more, of a mixture or substance containing a detectable amount of cocaine base, also called "crack," a Schedule II narcotic controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 846; and in Count Two, with knowingly and intentionally possessing firearms in furtherance of a drug trafficking offense which could be prosecuted in a United States Court, or aiding an abetting another in doing so, in violation of 18 U.S.C. §§ 2 and 924(c). With respect to Count One, the Grand Jury also made a special finding, pursuant to United States Sentencing Guidelines § 1B1.3(a)(1)(B), that it was reasonably foreseeable to the defendant that members of this jointly undertaken criminal conspiracy distributed or possessed with intent to distribute more than 1.5 kilograms of mixtures and substances containing detectable amounts of cocaine base, also called "crack," in and between December 2002 and December 2004. In addition, the Grand Jury made a special finding, pursuant to USSG § 2D1.1(b)(1),

-1-

that the defendant possessed firearms, aided and abetted another defendant in possessing firearms, or was otherwise responsible for the firearms possession by another defendant as a reasonably foreseeable consequence of the conspiracy. On May 6, 2005, a plea hearing was conducted before the undersigned, and the defendant entered a plea of guilty to Counts One and Two of the Indictment without having entered into any plea agreement between defendant and the government.

At this hearing the defendant was placed under oath and testified that his full legal name is Mario Alberto Garcia Holguin, that he was born on March 22, 1976, and that he completed the seventh grade. The defendant stated that he can read and understand, but cannot write, the English language. The defendant stated that he was fully aware of the nature of the charges against him and the consequence of pleading guilty to those charges. The defendant further testified that he was not under the influence of alcohol, medicine, or any drug. Defendant stated that he was subject to no other physical or mental condition that impaired his ability to understand the nature of the proceedings being held. Defendant's counsel stated that he had no reservations as to the defendant's competency to enter a plea of guilty to these offenses.

The defendant testified that he had received a copy of the Indictment pending against him and that he had fully discussed the charges therein, and his case in general, with his counsel. The defendant stated that he was pleading guilty of his own free will because he was, in fact, guilty of the offenses charged. The defendant also stated that no one had made any promises, assurances or threats to him in an effort to induce his plea, and that he had no plea agreement with the United States. The defendant testified that he understood that the offenses with which he is charged are felonies and that, if his plea is accepted, he will be adjudged guilty of such offenses.

The defendant was informed that the maximum possible penalty provided by law for the

offenses with which he is charged is, in the case of Count One, life imprisonment and a $4 million fine, together with supervised release; in the case of Count Two, life imprisonment and a $250,000 fine, together with supervised release. The defendant also was informed that the minimum mandatory sentence for Count One is ten years in prison, together with supervised release, and for Count Two, five years in prison, together with supervised release.

The defendant was informed under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining the sentence in a criminal case. The defendant was then informed that, in light of the United States Supreme Court's decision in *United States v. Booker*, 2005 WL 50108 (U.S. Jan. 12, 2005), the sentencing guidelines are no longer mandatory but that the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that he and his counsel had discussed how the sentencing guidelines might apply in his case. The defendant also testified that he understood that the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report has been prepared and both parties have an opportunity to challenge the reported facts and the application of the guidelines. He stated that he understood that the eventual sentence imposed may be different from any estimate his attorney has given him and that the court has the authority to issue a sentence that is either higher or lower than that called for by the guidelines, so long as the sentence is not greater than the statutory maximum for the offenses to which the defendant is pleading guilty. The defendant stated that he knew that parole had been abolished and that if he is sentenced to prison he will not be released on parole but on supervised release, a violation of which could result in additional incarceration.

The defendant testified that he understood that he had the right to a trial by a jury, in addition

to the following rights, which will be waived or given up if his guilty plea is accepted:

1. The right to plead not guilty to any offense charged against him;
2. The right at trial to be presumed innocent and to force the government to prove his guilt beyond a reasonable doubt;
3. The right of assistance of counsel;
4. The right to see, hear and cross-examine witnesses;
5. The right to call witnesses to testify in his own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses; and
6. The right to decline to testify unless he voluntarily elected to do so in her own defense;
7. The right to a unanimous guilty verdict;
8. The right to appeal a guilty verdict.

The defendant also testified that he understood that if he is adjudged guilty of these charges, he may be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm.

The defendant stated that he was fully satisfied with the advice and representation given to him in this case by his counsel. The defendant also testified that he understood the possible consequences of his plea. The defendant asked the court to accept his plea of guilty to Counts One and Two of the Indictment.

## THE GOVERNMENT'S EVIDENCE

The defendant waived his right to have the government's Factual Summary read in open court and had no objection to the Summary. The Factual Summary having been filed in open court, the evidence presented therein regarding the offenses charged is as follows:

The defendant, Mario Holguin, was as a powder cocaine supplier from Warren County, Virginia and carried a firearm while in relation to a drug trafficking offense. The following information pertaining to the defendant's distribution of powder cocaine was obtained via interviews, LE observations and proffers:

Brandi Knight stated in an interview that she knew Freeman to sell marijuana, but he told her that he would trade marijuana for cocaine to the defendant. Knight stated that she went with Freeman to Middletown where he picked up six ounces of marijuana from an unknown white male. Freeman informed Knight that he was trading it to the defendant for six grams of cocaine. Freeman dropped Knight off before completing the transaction.

Derek Lucie stated in an interview that he met Jordan near the end of 2002 and dealt with him until the end of May 2003. Lucie advised that Jordan was his supplier of crack and he sold for Jordan during that time span. Lucie stated that he was aware that the defendant supplied Jordan numerous ounces of cocaine.

Mike Cooper stated in an interview that he knew Jordan's cocaine suppliers to be the defendant and two other Mexican males.

Bryan Duncan stated in an interview that he was introduced to the defendant by Bryan Young. The defendant advised Duncan that he could deal directly with him and would not have to go through Young. Duncan stated that the defendant gave him wholesale prices on powder cocaine. Duncan stated that he acquired between ¼ to 1 ounce of cocaine from the defendant twice a week until the end of November of 2003. Duncan stated that in October 2003, the defendant asked Duncan to go to Seattle, Washington to pick up a carload of cocaine and transport it back to Virginia. The defendant offered Duncan $5,000 for the task, but Duncan refused the offer.

Chance Whittington stated in a proffer that the defendant was Waverly Jordan's cocaine connection. In addition, the defendant assisted in negotiating cocaine and recalled being present during the purchase of approximately 9 ounces of powder cocaine and 5 pounds of marijuana from "Raphael" an unknown Mexican male for $13,000 in approximately July 2003. Whittington stated

that on occasion the defendant would borrow Jordan's .25 caliber pistol and carry it during large purchases of powder cocaine in Winchester, Virginia for Jordan.

Andre Frye stated in an interview that while at the Pioneer Motel, the defendant and Angel Lnu stopped by and Jordan went outside to meet with them. When Jordan returned inside, he had approximately an ounce of powder cocaine packaged in a plastic baggie.

Jennifer McClellan stated in an interview that she was with Jordan on three occasions when he obtained cocaine from the defendant. On the first occasion, Jordan, Whittington, and McClellan traveled to Cherrydale Avenue, where the defendant was living. Jordan obtained an ounce of powder cocaine from the defendant. At that time, McClellan observed the defendant in possession of numerous ounces of cocaine. The second transaction occurred at Jennifer Kenny's residence. Present for the second deal were Kenny, Jordan, Whittington, and McClellan. Jordan obtained one-half ounce from the defendant, and McClellan only observed the defendant with the amount that he sold to Jordan. On the third occasion, the deal occurred at McClellan's residence. McClellan stated that she did not know how much Jordan bought, since the defendant took Jordan to a back bedroom to conduct the deal. McClellan advised that the defendant had possession of a small silver semi-auto pistol. McClellan stated that the defendant carried the pistol in the waistband of his pants, near his back.

Chris Martin stated in an interview that he was aware that Jennifer Kenney and Waverly Jordan were buying cocaine from the defendant. Martin stated that the defendant generally sells ounce quantities of cocaine. Martin stated that in June 2004 he observed the defendant distribute three ounces of cocaine to unknown individuals for $800.00 per ounce. Martin advised that the defendant would usually get one to five ounces of cocaine at a time. Martin accompanied the

defendant on two occasions when the defendant obtained cocaine.

Natasha Markle stated in a proffer that she met the defendant through Waverly Jordan. Jordan had told Markle that the defendant was one of his hook-ups for cocaine. Markle said she used powder cocaine, crack cocaine, and marijuana with the defendant on several occasions.

Waverly Jordan stated in a proffer that, from approximately April to July 2003, Jordan purchased approximately 6 ounces of powder cocaine a week from the defendant. Jordan stated that he converted a portion of the cocaine into "crack" for distribution. During this period, Jordan stated that the defendant possessed a .25 semiautomatic pistol and a 9mm semiautomatic pistol.

**PROPOSED FINDINGS OF FACT**

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

1. The defendant is fully competent and capable of entering an informed plea;
2. The defendant is aware of the nature of the charges and the consequences of his plea;
3. The defendant knowingly and voluntarily entered a plea of guilty to Counts One and Two of the Indictment; and
4. The evidence presents an independent basis in fact containing each of the essential elements of the offenses to which the defendant is pleading guilty.

**RECOMMENDED DISPOSITION**

Based upon the above findings of fact, the undersigned RECOMMENDS that this court accept the defendant's plea of guilty to Counts One and Two of the Indictment and adjudge him guilty of that offense. The undersigned further DIRECTS that a presentence report be prepared and

RECOMMENDS that the presiding District Judge defer acceptance of the defendant's plea until after that report has been submitted to the Court. A sentencing hearing hereby is scheduled for August 10, 2005 at 9:30 a.m. before the presiding District Judge in Harrisonburg.

**NOTICE TO PARTIES**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within ten days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The presiding District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send certified copies of this Report and Recommendation to all counsel of record.

ENTERED: _____
United States Magistrate Judge

5/13/05
Date